Jeena Jiampetti, SB# 251075
Email: jeena@benefitslaw.com
Cassie Springer Ayeni, SB# 221506
Email: cassie@benefitslaw.com
**SPRINGER AYENI,**
**A Professional Law Corporation**
123 Estudillo Avenue, Suite 201
San Leandro, CA 94577
Telephone:  510.926.6768
Facsimile:  1.510.926.6768

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## San Francisco/Oakland Division

| | |
|---|---|
| ANISHA SEKAR<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>GUARDIAN LIFE INSURANCE COMPANY,<br><br>　　　　　Defendant. | Case No. 4:22-cv-0342<br><br>**COMPLAINT (ERISA)** |

## I.    JURISDICTION AND VENUE

1.    Plaintiff Anisha Sekar ("Ms. Sekar" or "Plaintiff") brings this action for declaratory, injunctive, and monetary relief pursuant to §§ 502(a)(1)(B) and 502(g) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and 1132(g).  This Court has subject matter jurisdiction over Plaintiff's claim under 29 U.S.C. §§ 1132(e), (f), and (g), as it involves a claim by Plaintiff for disability benefits under an employee benefit plan regulated and governed by ERISA.  Jurisdiction is predicated under these code sections as well as 28 U.S.C. §1331, as this action involves a federal question.

2. On information and belief, Guardian Life Insurance Company, ("Guardian" or "Defendant") is, and at all times herein mentioned has been, licensed to do business in California.

3. Venue is proper under 29 U.S.C. § 1132(e)(2) because Plaintiff resides in and was employed in this District, and the ERISA-governed plan at issue was administered in part by Defendant in this District.

## II.   INTRADISTRICT ASSIGNMENT

4. The San Francisco/Oakland Division of this judicial district would be the appropriately assigned division, pursuant to Civil L.R. 3-2, as Plaintiff resides in this Division and Defendant may be found in this Division.

## III.   PARTIES

**A. Plaintiff**

5. Prior to stopping work in or around August 2020, Ms. Sekar was employed by Nvest, Inc. ("Nvest") as a Product Manager.

6. At Nvest, Ms. Sekar participated in her company's ERISA benefit plans, including the short-term disability ("STD") and long-term disability ("LTD") plans sponsored by Nvest (together, "the Plans").

7. At all relevant times, Plaintiff was and is a participant in the Plans, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

**B. Defendant**

8. At all relevant times, Defendant insured and administered the Plans.

9. At all relevant times, Defendant exercised authority or control respecting management of the Plans and/or had authority or responsibility in the administration of the Plans.

10. At all relevant times, Defendant was and is a fiduciary of the Plans as defined by ERISA § 3(21), 29 U.S.C. § 1002(21).

## IV.   FACTS

**A. Vocational Background**

11. Ms. Sekar began working for Nvest (dba SigFig) as a product manager in 2018.  On information and belief, Nvest/SigFig is a financial technology company that offers, among other products, digital portfolio management for investment accounts.

12. In May 2020, just a couple of months prior to her medical leave, Ms. Sekar was promoted and became a people manager and product lead on the company's most crucial project.

13. Generally, Ms. Sekar's job duties included collaborating with sales and business teams to decide what products to build and then working with designers and software engineers to oversee the builds of those products.  The position involved face-to-face and online meetings, real-time interaction with colleagues, and substantial strategic thinking.

14. Nvest described the role as requiring significant amounts of problem solving, new information processing, concentration, and typically 2-4 hours of daily video meetings.  Nvest emphasized that the job is sedentary, but without the cognitive ability to perform the aforementioned tasks, a product manager would not be able to complete their job responsibilities.

15. Outside of work, Ms. Sekar had an active and busy life that included long-distance running, a regular yoga practice, and rock climbing.  She was also taking a history class "just fun" and writing a novel at the pace of 3,000 words per week.

16. Ms. Sekar is an extremely goal-oriented person.  For the 10 years preceding her disability she ran one marathon a year.  For the 5 years preceding her disability she would create 24 annual goals and achieved 75% of those goals.  Her goals for 2020 included volunteering, mentoring other women in product management, writing a novel, getting public speaking appearances, and sport climbing.  In 2018, she articulated a 2-year plan to become either a director of product at a company or start a company and she was on track to achieve that goal before she became disabled.

17. By all accounts, Ms. Sekar was a highly motivated individual who was excelling at her career prior to her medical leave in August 2020.

**B. Medical History**

18. Ms. Sekar was 29 years old in June 2020 when she was exposed to COVID-19.

19. Following that exposure, Ms. Sekar began to experience shortness of breath, chest pain, sore throat, brain fog and fatigue that lasted for 2 weeks. Most of her symptoms resolved, except for the fatigue.

20. Approximately one month later, in or around July 2020, Ms. Sekar's symptoms returned and she had shortness of breath, lack of concentration, cardiac palpitations, left arm numbness/tingling and tongue numbness, in addition to continued fatigue.

21. Ms. Sekar was seen in the emergency room on July 29, 2020, but labs and cardiac findings were unremarkable. She had a pulmonary evaluation on August 12, 2020 for chest tightness and lingering flu-like symptoms and it was determined that her symptoms were likely due to chest wall irritation and inflammation.

22. At her worst, Ms. Sekar barely had enough energy to eat, feed her cat, or go to the bathroom and she did not have enough strength to brush her teeth.

23. Ms. Sekar struggled to keep working despite her symptoms, but on or around August 20, 2020, she took a medical leave from work.

24. By October 2020, Ms. Sekar had regained some cognitive and physical capacity and was eager to return to work. Although she continued to experience neurological symptoms, Ms. Sekar's treating physician, Dr. Spitalewitz, cleared her to work 8-10 hours per week.

25. After returning to work, Ms. Sekar's condition deteriorated and she experienced an increase in headaches, fatigue, and other symptoms. When possible, Ms. Sekar worked while lying in bed and she struggled to make it through

30-minute zoom calls.  She was also moved off a strategic project to less cognitively-intense work.

26. Even with this significantly reduced work schedule and responsibility, Ms. Sekar relied on microwaved meals, an automatic litterbox, and a robot vacuum because she did not have the energy to cook or clean.

27. In November 2020, Ms. Sekar was invited to join the founding team of a start up as its chief product officer—which would fulfill her 2-year plan—but she demurred because she was already struggling with 8 hours per week of lower-level product work.

28. In December 2020 and January 2021, Ms. Sekar experienced some improvement in her pain and exhaustion.  Despite her lingering cognitive issues, she hoped that she'd turned a corner in her recovery and would soon be able to resume normal activities.

29. Unfortunately, Ms. Sekar's physical improvement was short-lived and her condition deteriorated.  She struggled with hours to days of numbness in her tongue, brain fog, exhaustion, joint pain and body aches, and sore throat, and her symptoms worsened with attempts to push herself physically and cognitively.

30. In or around March 2021, Ms. Sekar stopped working for SigFig to focus on her health.

31. Ms. Sekar has been diagnosed with post-viral fatigue syndrome (PVFS) consistent with post-acute sequelae of SARS-CoV-2 (PASC or "long COVID"), chronic fatigue syndrome, and postural orthostatic tachycardia syndrome (POTS), among other conditions.  In May 2021, she was accepted as a patient at Stanford's Myalgic Encephalomyelitis/Chronic Fatigue Syndrome (ME/CFS) clinic.

32. On information and belief, PVFS is a complex condition triggered by a viral infection.  The primary symptom is significant fatigue, but other symptoms may include sore throat, swollen lymph nodes, muscle or joint pain, headache, and concentration or memory problems.

33. On information and belief, PASC is a condition marked by the continuation of COVID-19 symptoms or the emergence of new symptoms following acute COVID-19.

34. On information and belief, diagnostic criteria for CFS/ME consist of (1) a substantial reduction or impairment in the ability to engage in pre-illness activity levels for more than 6 months, accompanied by often profound fatigue, and which is of new or definite onset (not lifelong), is not the result of ongoing excessive exertion, and is not substantially alleviated by rest, (2) post-exertional malaise, and (3) unrefreshing sleep, as well as (4) either cognitive impairment, which often takes the form of "brain fog," or orthostatic intolerance.

35. On information and belief, POTS is a blood circulation disorder that can cause light-headedness (occasionally with fainting), difficulty thinking and concentrating, fatigue, intolerance of exercise, headache, blurry vision, heart palpitations, tremor, and nausea.

36. Ms. Sekar's condition is such that she needs her partner and family to assist her with daily activities.  Most of her time is spent resting and conserving her energy, but on her best days she may be able to go on a short walk, wash her hair, and do the dishes without "crashing."  She relies on an automatic litter box, robot vacuum, monthly housecleaner, microwaved meals, or food delivery, in addition to assistance from her family and partner.

**C. Administration of Ms. Sekar's Claim for Benefits**

37. Ms. Sekar stopped working in or around August 2020 and subsequently applied for STD benefits due to post-viral fatigue and complications from COVID-19, including severe fatigue, shortness of breath and extremely low threshold for mental exertion, and neurological symptoms such difficulty concentrating, aphasia, and pins and needles sensations.

38. Defendant received Ms. Sekar's application for STD benefits on or around August 20, 2020 and paid STD benefits through October 11, 2020.

39. While Defendant was reviewing Ms. Sekar's STD claim for continued STD benefits, she submitted an application for LTD benefits that was received by Defendant on or about February 27, 2021.

40. In a letter dated March 2, 2021, Defendant informed Ms. Sekar that no further STD benefits were payable beyond October 12, 2020 and it would not be reviewing her eligibility for LTD benefits. According to the letter, Ms. Sekar was denied further disability benefits because Defendant's internal nurse case manager had determined that the medical information on file did not support a significant level of functional impairment and/or restrictions and limitations that prevented her from working in her usual occupation.

41. In a letter dated March 3, 2021, Defendant informed Ms. Sekar that it had reviewed her LTD claim and was denying benefits because the medical information submitted did not provide objective evidence of her inability to work in her occupation.

42. On or about March 18, 2021, Ms. Sekar initiated an appeal of her STD termination.

43. On or about March 24, 2021, with the assistance of her parents and her partner, Ms. Sekar submitted an appeal of her LTD denial.

44. Ms. Sekar's March 24, 2021 appeal letter clearly stated that her primary disabling symptoms are neurological/cognitive and any improvement in her physical symptoms should not be confused with the ability perform cognitively-intensive tasks. The appeal also noted that Ms. Sekar's overall condition—both physical and cognitive—had retrogressed since January 2021, likely as a result of her returning to limited part-time work.

45. The appeal letter also enclosed a March 19, 2021 letter from Dr. Spitalewitz indicating that Ms. Sekar is precluded from working more than 10 hours per week due to persistent neurological symptoms such as brain fog, headaches, and difficulty concentrating and speaking. According to Dr. Spitalewitz, Ms. Sekar's

condition limits many activities of daily living and work functionality and her condition has retrogressed, rather than progressed, while attempting to sustain her very limited workload of 8-10 hours. Dr. Spitalewitz also noted that PVFS/PASC is not conducive to diagnosis by objective testing.

46. On or about May 19, 2021, at Defendant's request, Ms. Sekar provided a letter from her treating therapist and her treating psychiatrist. Ms. Sekar's therapist noted the dramatic change in Ms. Sekar's condition after June 2020, including difficulty completing sessions, slow rate of speech, and memory and concentration issues. Ms. Sekar's psychiatrist opined that Ms. Sekar's worsening fatigue, new cognitive difficulty, and lengthy recovery are unlikely the result of a pre-existing depressive illness.

47. On or about June 17, 2021, at Defendant's request, Ms. Sekar provided updated medical records from Dr. Spitalewitz documenting a worsening of symptoms since December 2020.

48. In June 2021, at Defendant's request, Ms. Sekar also submitted a cognitive assessment form indicating that the assessor found Ms. Sekar had moderate limitations with reading, writing, speech, comprehension, executive function, memory, orientation, attention, and concentration.

49. On or about June 30, 2021, Ms. Sekar further supplemented her appeals with the following information:

- medical records from the Stanford ME/CFS clinic documenting that she meets the diagnostic criteria for ME/CFS diagnosis and her treatment includes pacing/rest, medication, diet and supplements, and lifestyle changes;
- a detailed diary/timeline of her symptoms and how she budgets her time and energy to complete activities of daily living and other tasks;
- a letter from her partner describing the deterioration of her condition, including occasionally using a cane for support while walking;
- a letter from her former manager at SigFig explaining that even with

significant accommodations Ms. Sekar struggled to competently perform tasks and regularly called in sick;

- a letter from a former colleague noting that following her illness, Ms. Sekar had frequent sick days, missed meetings, and was unable to think or speak clearly; and

- medical literature regarding MS/CFS.

50.  After receiving Ms. Sekar's appeal documents, Defendant conducted an internal medical review and determined that Ms. Sekar's cognitive limitations needed to be clarified with an independent medical review.

51.  Defendant selected Dr. Uchechukwu Elendu (Internal Medicine and Occupational Medicine) to perform the paper-based review of Ms. Sekar's file.  In his report, Dr. Elendu agreed that Ms. Sekar has post-viral fatigue syndrome, but specified that **cognitive impairment is outside his speciality** (emphasis added). Nevertheless, Dr. Elendu concluded that Ms. Sekar did not have functional limitations precluding employment because there were no restrictions and limitations from a physical standpoint.

52.  Despite Dr. Elendu's previous statement that cognitive impairment is outside his specialty, Defendant sought an addendum report from him regarding Dr. Spitalewitz's March 19, 2021 letter that detailed Ms. Sekar's persistent neurological symptoms.  In the addendum, Dr. Elendu said he disagreed with Dr. Spitalewitz's opinion and found that there was no clinical support for the restrictions and limitations she imposed.

53.  On July 27, 2021, after receiving a brief summary of Dr. Elendu's conclusions, Ms. Sekar emailed Defendant to express concern that Dr. Elendu lacked the appropriate experience and understanding of CFS and long COVID to render an opinion.

54.  On information and belief, Dr. Elendu has expressed the opinion that conditions such as fibromyalgia and chronic fatigue syndrome can never be the

basis of LTD claims. On information and belief, Dr. Elendu's position on fibromyalgia and chronic fatigue syndrome has been rejected by at least one court. *See Batchelor v. Life. Ins. Co. of North America*, 504 F. Supp.3d 607, 623 (S.D. Texas 2020).

55. In an email to Defendant dated August 9, 2021, Ms. Sekar stressed that Dr. Elendu was never provided her Stanford CFS/ME records and therefore did not provide a full review of the available medical evidence.

56. Defendant subsequently requested that Dr. Elendu provide a second addendum considering the Stanford ME/CFS medical records and the restrictions and limitations consistently imposed by Ms. Sekar's providers.

57. As part of his third review of Ms. Sekar's file, Dr. Elendu sent a questionnaire to Dr. Spitalewitz asking her to clarify Ms. Sekar's restrictions and limitations. Dr. Spitalewitz responded that Ms. Sekar is unable to work or sustain physical activity because both result in debilitating pain and fatigue and that the current standard of care for Ms. Sekar's conditions is to limit all activities to tolerability and to avoid work or leisure activities that induce flares.

58. Dr. Elendu's issued second addendum report that yet again rejected Dr. Spitalewitz's opinion, as well as the new Stanford ME/CFS records, and concluded that Ms. Sekar's conditions would not impact her capability to work.

59. In a letter dated September 13, 2021, Defendant upheld its termination of Ms. Sekar's STD benefits and its denial of LTD benefits on the grounds that there was no objective medical evidence to support restrictions and limitations that would preclude Ms. Sekar from performing the major duties of her own occupation as of October 12, 2020.

60. The letter also informed Ms. Sekar that all administrative remedies have been exhausted.

61. This lawsuit followed.

**D. Plan Terms**

62. Under the terms of the STD Plan, a person is deemed totally disabled if, as a result of sickness or injury, the individual is unable to perform with reasonable continuity the substantial and material acts necessary to pursue their usual occupation is the usual or customary way.

63. A person is partially disabled under the STD Plan if while working in an occupation they are unable to earn 80% or more of their pre-disability earnings as a result of sickness or injury.

64. The STD Plan has a 7-day elimination period and the maximum STD benefit period is 12 weeks.

65. Under the terms of the STD Plan, Ms. Sekar's weekly STD benefits are 60% of her pre-disability earnings, as defined by the Plan, less offsets for disability earnings and other income benefits.

66. Under the terms of the LTD Plan, during the elimination period and for the first 24 months of eligibility, a person is deemed totally disabled if, as a result of sickness or injury, they are unable to perform with reasonable continuity the substantial and material act necessary to pursue their usual occupation and are not working in their usual occupation.

67. After 24 months, a person is deemed totally disabled if, as a result of sickness or injury, they are not able to engage with reasonable continuity in any occupation in which they could be reasonably expected to perform satisfactorily in light of their age, education, training, experience, station in life, and physical and mental capacity.

68. Under the LTD Plan, a person is partially disabled if while working in an occupation they are unable to engage with reasonable continuity in that or any other occupation in which they could be expected to perform satisfactorily in light of their age, education, training, experience, station in life, and physical or mental capacity due to as result of sickness or injury.

69. The LTD Plan's elimination period is the later of the end of the maximum period for which benefits are payable under the employer's STD plan or 90 days. The maximum benefit period is the Social Security normal retirement age.

70. Under the terms of the LTD Plan, Ms. Sekar's monthly LTD benefits are 60% of her pre-disability earnings, as defined by the Plan, less offsets for disability earnings and other income benefits.

## V.   CAUSE OF ACTION

### COUNT I:

**[Claim for Benefits Pursuant to ERISA § 502(a)(1)(B)]**

71. Plaintiff incorporates Paragraphs 1 through 70 as though fully set forth herein.

72. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due under the terms of a plan, to enforce rights under the terms of a plan, and/or to clarify rights to future benefits under the terms of a plan.

73. At all relevant times, Plaintiff has been entitled to benefits under the Plans. By terminating Plaintiff's STD benefits, denying her application for LTD benefits, and by related acts and omissions, Defendant has violated, and continues to violate, Plaintiff's right to benefits under the Plans.

### PRAYER FOR RELIEF

74. WHEREFORE, Plaintiff prays that the Court grant the following relief:

75. Order Defendant to pay STD and LTD benefits to Plaintiff pursuant to the terms of the Plans through the date judgment is entered herein, together with prejudgment interest on each and every such monthly payment through the date judgment is entered herein;

76. Declare Plaintiff's right to receive future LTD benefit payments under the terms of the LTD Plan for as long as she remains disabled under the LTD Plan's terms;

77. Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and

78. Provide such other relief as the Court deems equitable and just.

Dated: January 19, 2022          Respectfully submitted,

<u>/s/ *Jeena Jiampetti*</u>
Jeena Jiampetti
SPRINGER AYENI,
A PROFESSIONAL LAW CORPORATION
*Attorneys for Plaintiff*